```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
LIBERTY RE (BERMUDA) LTD.,            :
                Petitioner,           :      MEMORANDUM
                                      :         AND
     - against -                      :        ORDER
                                      :
TRANSAMERICA OCCIDENTAL LIFE          :   04 Civ. 5044 (NRB)
INSURANCE COMPANY,                    :
                Respondent.           :
-------------------------------------x
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Petitioner Liberty Re (Bermuda) Ltd. ("Liberty Re" or "petitioner") moves for confirmation and enforcement of a unanimous arbitration award (the "Award"). Respondent Transamerica Occidental Life Insurance Company ("Transamerica" or "respondent") moves to stay the Award and urges this Court to remand the Award to the arbitration panel (the "Panel") for clarification. For the reasons set forth below, we confirm the Award in its entirety, and remand the Award for clarification in accordance with this Order.

## BACKGROUND[1]

Both Liberty Re, a Bermuda corporation, and Transamerica, an Iowa corporation, are in the reinsurance business. The instant action involves a retrocessional agreement between Transamerica and

---

[1] The following factual background is drawn from the parties' statements pursuant to Local Civil Rule 56.1, and is not in dispute.

Liberty Re (the "Retro Agreement"), whereby Liberty Re agreed to reinsure a portion of the reinsurance that Transamerica provided to a third-party, The Equitable Life Insurance Company ("Equitable"). Under the agreement between Transamerica and Equitable (the "Equitable Agreement"), Transamerica contracted to provide Equitable with reinsurance for certain of Equitable's variable annuity insurance products. Through the Retro Agreement, Liberty Re agreed to reinsure Transamerica for a portion of the risk presented by the Equitable policies.

The underlying policies permit individual policyholders to deposit their premium payments into individual investment accounts.[2] Individuals can then allocate their deposits among a limited selection of investment options provided by Equitable, including various equity and bond mutual funds. An individual policyholder's account value, therefore, depends on the performance of that individual's specific investment allocations. The Equitable policies in question also include two types of guaranteed minimum benefits to policyholders--the Guaranteed Minimum Death Benefit and the Guaranteed Minimum Income Benefit.[3] Because in

---

[2] For a more detailed description of the Equitable variable annuity product, see Accumulator Prospectus, Liberty Re's 56.1 Statement, App. Ex. 2.

[3] The applicability of these provisions and the calculation of the guaranteed amounts are described fully in the Accumulator Prospectus. See Accumulator Prospectus, Liberty Re's 56.1 Statement, App. Ex. 2 at 18-20.

some situations an individual's account value might be less than the applicable guaranteed minimum payment, Equitable and its subsequent reinsurers face a potential loss when payment is due on such an account. By agreeing to provide reinsurance to Transamerica, Liberty Re assumed a certain percent of this risk from Transamerica.

In September of 2002, Liberty Re sought arbitration with Transamerica to settle certain disagreements regarding Liberty Re's rights and obligations under the Retro Agreement. First, the parties disputed whether the Retro Agreement contained a cap on the amount of reinsurance Liberty Re would provide Transamerica. Second, Liberty Re claimed that Transamerica had breached the provisions of the Retro Agreement by failing to obtain Liberty Re's consent prior to acceding to the inclusion of additional mutual funds to the Equitable Agreement. These new funds provided Equitable's policyholders with additional investment options for their accounts, but were not part of the list of allowed mutual funds included as part of the Retro Agreement. Accordingly, Liberty Re contended that it never agreed to reinsure Transamerica for the risk of loss associated with investments in these unapproved funds.

Pursuant to the parties' arbitration agreement, the Panel was selected in late 2002, and discovery conducted over the course of more than a year. From May 3 to May 7, 2004, the Panel held an

evidentiary hearing in New York City, and on May 7, 2004, the Panel issued its unanimous Award. The Award issued by the Panel consists of four short paragraphs:

> Neither Retrocessional Agreement Nos. 3845-2 Between Transamerica Occidental Life Insurance Company and Liberty Re (Bermuda) Ltd. (the "Retro Agreement") nor the communications relating to it imposes a limit or cap on the amount of subject business that can be ceded under the Retro Agreement.
>
> Transamerica was in breach of its reporting obligations under the Retro Agreement, thus depriving Liberty Re of information that might have led it to terminate the Agreement. Accordingly, when Liberty Re did manifest a decision to terminate by giving notice of termination (February 9, 1999), its decision should take effect immediately without a further 90-day delay.
>
> Any changes in the subject mutual funds not made by amendment to the Retro Treaty are null and void.
>
> No costs are awarded.

Liberty Re filed its petition for confirmation of the Award on June 25, 2004, and Transamerica answered on August 2, 2004. Liberty Re moved for summary judgment confirming and enforcing the Award on November 11, 2004, and Transamerica moved to stay confirmation on December 3, 2004. Oral argument was had on the motions on February 16, 2005.

**DISCUSSION**

**I. Applicable Law**

Review of an arbitration award by a district court is extremely restricted. "Arbitrations awards are subject to a very limited review in order to avoid undermining the twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation." Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir. 1997)(citations and internal quotation marks omitted). Courts must not "go beyond the award to decide questions that the arbitrator did not decide." Rizzo v. Zalkin, No. 92 Civ. 6127, 1994 WL 114836, at *6 (S.D.N.Y. Mar. 31, 1994). Accordingly, "the confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." Florasynth Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984).

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") applies to awards "not considered as domestic awards in the State where there recognition and enforcement are sought."[4] Convention art. I(1); Yusuf Ahmed

---

[4] The parties agree that the New York Convention applies to this Award, as Liberty Re is a Bermuda corporation, Transamerica is an Iowa corporation, and the parties are seeking enforcement in New York. Bergesen v. Joseph Muller Corp., 710 F.2d 928, 932 (2d Cir. 1983).

Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 18-19 (2d Cir. 1997). Under the New York Convention, a court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in said Convention." 9 U.S.C. § 207. See Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd., 191 F.3d 194, 196 (2d Cir. 1999). Summary confirmation of the Award is properly withheld if a party establishes a statutory exceptions applies.[5]

In addition to these statutory exceptions, "a district court may also consider challenges to an award's clarity when considering a petition for confirmation." In re Gerling Global Reins. Corp. v. Yasuda Fire & Marine Ins. Co., No. 98 Civ. 9185, 1999 WL 553767, at *1 (S.D.N.Y. Jul. 29, 1999). However, a court should not endeavor to formulate its own interpretation of an unclear arbitration award. Accordingly, "a court should not attempt to enforce an award that is ambiguous or indefinite" but should "remand[] [the award] to the arbitrators so that the court will know exactly what it is being asked to enforce." Americas Ins. Co. v. Seagull Compania Naviera, S.A., 774 F.2d 64, 67 (2d Cir. 1985)(internal citation omitted); accord Hyde v. Doctor's Assoc., Inc., 198 F.3d 368, 370 (2d Cir. 1999); Alcatel Space, S.A. v. Loral Space &

---

[5] There are seven grounds for refusing confirmation under the New York Convention, see Convention art. V, none of which is alleged by Transamerica. Instead, Transamerica challenges the Award on the basis of its clarity, and argues that a stay is permitted under Article VI of the New York Convention.

Communications Ltd., No. 02 Civ 2674, 2002 WL 1391819, at *4 (S.D.N.Y. June 25, 2002); In re Gerling Global Reins. Corp., 1999 WL 553767, at *1. However, an "award may be confirmed where the true intent of the arbitrator is apparent." Id. at *2; see also Blue Tree Corp. v. Koehring, 808 F. Supp. 343, 347 (S.D.N.Y. 1992).

**II. Analysis**

As the motions have been framed, the only issue presented is the clarity of the Panel's Award. Accordingly, we review the language of the Award with this issue in mind.

**A. Paragraphs 1 and 4 of the Award**.

The parties do not dispute the meaning or the effect of the first and last paragraphs of the Award, and accordingly, those paragraphs of the Award are confirmed.

**B. Paragraph 2**

Paragraph 2 of the Award states:

> Transamerica was in breach of its reporting obligations under the Retro Agreement, thus depriving Liberty Re of information that might have led it to terminate the Agreement. Accordingly, when Liberty Re did manifest a decision to terminate by giving notice of termination (February 9, 1999), its decision should take effect immediately without a further 90-day delay.

The alleged ambiguity in paragraph 2 concerns the nature of Liberty Re's obligations after termination. At issue are post-termination

deposits by individuals on policies issued prior to the termination date. Liberty Re contends that the Award terminates its obligation to reinsure all deposits by individuals made after February 9, 1999, including additional deposits on policies already in existence as of that date. Liberty Re's Mem. in Opp'n to Transamerica's Mot. to Stay at 23-24. Transamerica contends that Liberty Re's reinsurance obligations are policy-specific, and therefore the Award only releases Liberty Re from reinsuring new policies issued after February 9, 1999, not from reinsuring new deposits on policies existing as of the termination date. Transamerica's Mot. to Stay at 13.

The language of paragraph 2 does not address Liberty Re's post-termination obligations, nor does it appear that this issue was raised before the Panel. <u>See</u> Transamerica's Reply in Supp. of its Mot. to Stay at n.5. Furthermore, it is unclear from the record what the obligations of Liberty Re to reinsure post-termination deposits on policies would be if termination of the Retro Agreement had occurred in the normal course of business, and there is nothing to indicate whether the Panel intended the Award to alter Liberty Re's normal termination obligations in any way other than releasing Liberty Re from the ninety-day notification provision.

For these reasons, we agree with Transamerica that paragraph 2 of the Award is unclear with respect to Liberty Re's post-

termination obligations.  While this Court could offer its opinion on Liberty Re's normal post-termination obligations and whether the Award altered them, such an exercise would be outside the scope of our limited review of the Award.  See Yusuf, 126 F.3d at 25. Accordingly, we confirm the language of paragraph 2, but remand the issue of Liberty Re's liability for post-termination deposits on pre-existing policies to the Panel for clarification.  See Rizzo, 1994 WL 114836, at *6 (remanding new dispute to arbitrators for resolution).

**C. Paragraph 3**

Paragraph 3 of the Award states in a single sentence that "[a]ny changes in the subject mutual funds not made by amendment to the Retro Treaty are null and void."  Transamerica argues that this part of the Panel's Award is unclear in two respects.  First, paragraph 3 does not address Liberty Re's obligation to consider proposed amendments to the Retro Agreement.  Second, paragraph 3 does not specify the appropriate treatment of deposits invested in unapproved mutual funds.  Transamerica argues that these omissions make paragraph 3 of the Award so ambiguous as to warrant remand to the Panel.  For the following reasons, we disagree.

**1. Changes "Not Made by Amendment"**

The first alleged ambiguity arises from Transamerica's interpretation of the Award as "encouraging" future discussions between the parties.  Transamerica claims that paragraph 3's "use

9

of the word 'amendment' indicates the Panel contemplated a consultation between the parties that should lead toward a mutually acceptable decision." Transamerica's Mot. to Stay at 4. The alleged problem with the Award is that it does not define how the parties are to reach a mutually acceptable decision. Transamerica argues that the failure to specify standards for approving amendments has allowed Liberty Re to reject amendments that Transamerica feels Liberty Re is required to accept under standards of commercial reasonableness. Without clarification by the Panel, paragraph 3 of the Award leaves Liberty Re with "no obligation whatsoever even to consider approving" amendments. Transamerica's 56.1 Statement at 18.

Unlike Transamerica, we see no evidence of any future obligations with respect to amendments in the language of paragraph 3, and thus no ambiguity arising from the omission of a standard defining Liberty Re's future obligations. Paragraph 3 contains no reference to any future negotiations between the parties, nor does the language impose any requirements on Liberty Re to accept amendments offered by Transamerica. Instead, the language of paragraphs 3 recognizes Liberty Re's contractual right to reject changes to the Retro Agreement, without any limitation of that

right expressed in the Award.[6]

Moreover, Transamerica's proposed interpretation would distort the intended result of paragraph 3 of the Award.  Transamerica's reading of paragraph 3 attempts to limit the scope of Liberty Re's rejection rights by reading certain requirements into the language of the Panel's Award.  Transamerica argues these requirements are necessary to prevent Liberty Re from unilaterally rejecting amendments.  Transamerica made a similar argument to the Panel during arbitration,[7] yet the language of the Award contains no such limits on Liberty Re's rejection rights.  If we were to impose a Transamerica's proposed requirements onto paragraph 3, it would alter the Award's clear meaning and contradict the Panel's intent.

Accordingly, we find the meaning of paragraph 3 is unambiguous, and does not obligate Liberty Re to accept Transamerica's now proposed amendments to the Retro Agreement.

2. **The Effect of Null and Void**

---

[6] At oral argument, Transamerica acknowledged the effect of paragraph 3.  Transamerica's counsel stated that "[prior to the Award,] [w]e didn't believe that Liberty Re had the right to reject funds and, therefore, we did not offer them amendments to change the fund menu.  We lost on that point."  Tr. at 15.

[7] In its brief to the Panel, Transamerica argued that Liberty Re's proposed "selection criteria [for approving new funds] is a commercially unreasonable and analytically irrational 'Fund Rejection Machine'."  Transamerica's Init. Pre-Hearing Brief at 53. Accordingly, the Panel was well-aware of Transamerica's position that, if given the right to reject funds, Liberty Re would use unreasonable criteria to reject proposed fund changes.

Second, Transamerica maintains that the Award is ambiguous because it provides no explanation of the effect of "null and void" on policyholders' deposits in unapproved funds.  Specifically, paragraph 3 does not address "how Liberty Re and Transamerica are to treat the investment by Equitable's policyholders in mutual funds that are 'null and void' as to Liberty Re."  Transamerica's Mot. to Stay, at 10 (emphasis omitted).  Liberty Re argues that it is not required to reinsure the unapproved funds, and thus policyholders' deposits in unapproved mutual funds should not count towards its reinsurance obligations.  Accordingly, Liberty Re seeks an order that such deposits be treated as withdrawals for purposes of its liability.  Transamerica acknowledges that Liberty Re is not responsible for reinsuring the unapproved funds, but maintains that Liberty Re should still be obligated for reinsuring individuals' deposits in unapproved funds.  As stated at oral argument, Transamerica's position is that

> Liberty Re is off the hook with respect to the risk presented by the funds that are null and void.  However, because those investors did not withdraw their money, what [Transamerica] is suggesting the Panel meant by null and void is to deem the money either not invested in the null and void funds or invested in funds of the same profile of the funds that they had originally approved.

Tr. at 7.

We find no support for Transamerica's interpretation of paragraph 3, nor do we find any ambiguity in paragraph 3's omission

of a procedure to account for deposits in funds outside the coverage of the Retro Agreement. On its face, the Panel's Award establishes that any mutual funds not added by amendment are outside the scope of the Retro Agreement. The logical result of this finding is that deposits by policyholders in those unapproved mutual funds are also not subject to the Retro Agreement. In its interpretation, Transamerica attempts to distinguish between the unapproved funds--which it concedes are null and void--and the deposits invested in those funds--which Transamerica argues are still covered by the Retro Agreement. This convoluted reading leads to an equally convoluted result: deposits invested in unapproved funds must be deemed invested elsewhere. There is no basis for such a result in the language of the Award, and it is reasonable to assume that if the Panel had intended such a counter-intuitive result, they would have mentioned as much in the Award. Moreover, the Panel was aware of Liberty Re's position that deposits in null and void funds should be treated as withdrawals,[8] yet made no reference to deeming such deposits as if invested elsewhere.

Transamerica's only real argument appears to be that by

---

[8] Liberty Re's initial position before the Panel was that the entire account value of an individual who invested any amount of money in unapproved funds should be treated as a withdrawal. See Pierce Aff., Ex. 20 (Hearing Tr. at 1516:16 - 1517:9). While Liberty Re no longer takes this position, Liberty Re's belief that deposits in unapproved funds should be treated as withdrawals was raised before the Panel.

13

treating the deposits as outside of the Retro Agreement, Liberty Re will receive an unwarranted windfall from the Award. While we are sympathetic to Transamerica's concern that it will now receive less coverage from Liberty Re, Liberty Re's windfall is inevitable given the language of the Award. An Award that substantially reduces the number of mutual funds covered by Liberty Re can lead to no other result.

**III. Sealing of the Record**

In connection with the arbitration, both parties signed a confidentiality agreement limiting the disclosure of any information exchanged in connection with the arbitration. Pursuant to that agreement, the parties request that the record in this matter, including this Court's opinion, be placed under seal.

There is a presumption of public access to judicial documents. United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995). This presumption is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." Id. When the information at issue forms the basis of the court's adjudication, the presumption of public access is at its strongest. Id. at 1049; see also U.S. ex rel. Alcohol Found., Inc. v. Kalmanovitz Charitable Found., Inc., 186 F. Supp. 2d 458, 465 (S.D.N.Y. 2002); Greater Miami

Baseball Club Ltd. P'ship v. Selig, 955 F. Supp. 37, 39 (S.D.N.Y. 1997). Conversely, the presumption of access is at its weakest in documents that have only a "negligible role in the performance of Article III duties." Amodeo, 71 F.3d at 1050. This presumption of access is not absolute, and can be overcome if a court determines that countervailing factors warrant confidentiality. Id. Such factors can include law enforcement concerns, the need for judicial efficiency, and the privacy interests of the parties resisting disclosure. Id.

The parties argue that their strong interest in confidentiality coupled with the federal policy of encouraging arbitration justify sealing the entire Court record. With respect to the documents the parties submitted to this Court that do not form the basis of our opinion, we agree. Applying the standard discussed above, the presumption of public access in these background documents is minimal, while the parties have an interest in keeping the detailed records of their arbitration from public view.

In the case of this Court's opinion, however, the strong presumption of public access to judicial decisions outweighs the parties interests in privacy. "An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny." Joy v. North, 692 F.2d 880, 893 (2d Cir. 1982); see also Commercial Union Ins. Co. v.

15

Lines, 239 F. Supp. 2d 351, 358 (S.D.N.Y. 2002) ("At a minimum, the Court's orders and decisions should be available for public review.") vacated and remanded on other grounds by 378 F.3d 204 (2d Cir. 2004). The parties cite no specific harm that will result from disclosure any confidential information, but rather rely on their confidentiality agreement. Accordingly, no exceptional circumstances are present here.

We note that had the parties wished to preserve the absolute confidentiality of the arbitration proceeding or the Award, there a number of alternatives they could have pursued but did not. In the first instance, the parties could have resubmitted any issues regarding the Award to the Panel for resolution there. After resorting to the courts, the parties could have factored into their consideration the likely public result and decided to settle the differences between them. While we have endeavored to accommodate the parties' interests as much as possible, their preferences simply cannot change the fact that this is a public forum and as such, our opinions are matters of public record. Having availed themselves of a public resource to settle their dispute, the parties are faced with a public result. Accordingly, the file will remain under seal in accordance with the earlier sealing order, but this opinion will be placed in the public file.

## CONCLUSION

For the reasons stated above, Liberty Re's motion to confirm and enforce the Award is granted. The outstanding issue of Liberty Re's obligation regarding post-termination deposits on pre-termination policies is remanded to the Panel for resolution.

**SO ORDERED.**

DATED:  New York, New York
        May 20, 2005

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing have been mailed on this date to the following:

<u>Counsel for Plaintiff</u>
Louis J. Schepp, Esq.
Robin, Scheff, Yuhas & Harris
1 Battery Park Plaza, ste 3018
New York, NY 10004

James I. Rubin, Esq.
Ira J. Belcove, Esq.
Amy B. Kelley, Esq.
Butler, Rubin, Saltarelli and Boyd
Three First National Plaza
70 West Madison St., ste 1800
Chicago, IL 60602

<u>Counsel for Defendant</u>
Kenneth R. Pierce, Esq.
Michael K. Robles, Esq.
Dwayne Shivnarain, Esq.
Cadwalder, Wickersham & Taft LLP
100 Maiden Lane
New York, NY 10038